BURNS v. MILLS.

A sold certain Jersey cattle to B, under an agreement that they should be "registered." There are two books of registry for Jersey cattle—"The American Jersey Herd Register," in which these cattle were

registered, and "The American Jersey Cattle Club Herd Registry," testified to by witnesses as the only recognized registration book of Jersey cattle in the country. *Held*, that the term "registered" in this contract being susceptible of two meanings, it was not to be interpreted as A intended B to understand it, unless B did so understand it, as he could not be held bound by a contract to which his mind had not assented.

Before NORTON, J., Greenville, April, 1888.

This was an action by William Burns against O. P. Mills, administrator, commenced February 18, 1887. The judge charged the jury as follows:

This is an action by Mr. Burns against the administrator of Mr. Mills, to whom it is alleged that the plaintiff sold six Jersey heifers for $525. The plaintiff proves that he made the sale to the defendant's intestate, Mr. L. A. Mills, at that price. The defendant set up in his answer that the cattle were to be registered, and he proves by one witness on the stand, who was present some time during the making of the contract, that they were to be registered. Now, if you believe that the contract was made for the sale of these six heifers for $525, the first inquiry for your considerations is, whether that registration was to be made or not. If you should come to the conclusion that there was to be a registration, that is, that the cattle were either to be registered, or be such cattle that they *could* be registered, then the contract, being a verbal one, is for your interpretation. The law in regard to a verbal contract is not what Mr. Burns intended by the contract, it is not what Mr. Mills intended by the contract; but if Mr. Burns made an offer to Mr. Mills, and Mr. Mills accepted it, it is what Mr. Burns intended Mr. Mills should understand by his promise that these should be registered cattle.

Now, Mr. Burns may have had one idea in his mind as to what a registered cow was, and Mr. Mills may have had another idea as to what a registered cow was; and Mr. Burns may have intended that Mr. Mills should understand that a registered cow should be what he (Burns) understood a registered cow to be; or he might have intended that Mr. Mills should understand what

he (Mr. Mills) understood it to be; that is, as I stated to you before, it was what he offered to do and what he intended that Mr. Mills should understand that he offered to do, that shall govern.

Now, that definition shall help you only in case you should come to the conclusion that registration has not been sufficiently defined to you by persons sufficiently competent to know. It might be that you sufficiently understand the technical word "registered," when applied to Jersey cattle, to give it a definite fixed meaning; and it is for you to say whether that definite fixed meaning was used by Mr. Burns when he guaranteed it. For what you say as to the quality, that is a guarantee, especially in matters which are not capable of being well known to the buyer or seller. If one of the calves' eyes had been out, Mr. Mills would have been obliged to see it, but in looking at the form, and all that, he could not tell whether they were capable of being registered or not; and so far as this matter is concerned, if Mr. Burns said that that cattle was registered, or capable of being registered, then the defendant would have been entitled to that guarantee—if he found that they were not registered, to return the cattle and rescind the contract. That is, if in your opinion the word registered means registered in the Club Book, and not in the Herd Book.

It may be that there are two sets of registration books by live clubs or live associations, and Mr. Mills may prefer one and Mr. Burns the other; or it may be that one of the books is by an association which is not recognized at all by experts in this business; and it need not be confined to experts in this particular locality, as it might be sectional differences. All those are matters for your consideration in coming to your conclusion. If you believe that the cattle were to be registered, you are to say whether they were registered according to the meaning that Mr. Burns intended Mr. Mills to understand by that term.

If you should come to the conclusion that Mr. Mills, with full knowledge of the facts, accepted this cattle, whether they were registered or unregistered, it would make no difference. If you buy property with the knowledge of the defects that are in it, and you receive that property, you would be bound by your con-

tract.   So if you received it before you knew of the defect, it
would be your duty to notify the party from whom you pur-
chased, at as early a day as practicable.   Failing to do so, you
would not be entitled to rescind the contract.   But it has been
held in this State that notwithstanding the failure of the party
to give that notice which he ought to have given, and his failure
to return the property as he ought to have returned it, perhaps,
that he can keep the property and not plead the discount that the
property did not come up to representation; that there is a failure
in the warranty, and to the extent that he proves that there is a
failure in the warranty, to that extent is he entitled to a deduc-
tion in the property he has bought.

The burden of proof as to the contract is upon the plaintiff to
show that the $525 was to be paid; and then the burden of proof
is upon the defendant to show that he is entitled to a failure of
contract, or a deduction of what he bought.   He who has the
burden of proof upon him must show it by a preponderance of
the testimony, and if the party who should prove it has failed,
then you will find for the other party.   For instance, suppose
you believe it doubtful as to whether any contract was made or
not, then you will find for the defendant.   If you find that there
was a contract and that the contract is proven, you will find for
the plaintiff with interest.

The verdict being for plaintiff and judgment entered thereon,
the defendant appealed.

*Messrs. Thomson, Nicholls & Moore*, for appellant.

*Messrs. Bomar & Simpson*, contra.

April 15, 1889.   The opinion of the court was delivered by
MR. JUSTICE MCGOWAN.   It seems that in May, 1883, the
plaintiff sold and delivered to the intestate, L. A. Mills, of Spar-
tanburg, six Jersey heifers for $525.   The plaintiff claimed that
the contract (which was verbal) was cash on delivery; but some
contention arose as to the blood, and especially as to the "regis-
try" of the animals.   In 1885 L. A. Mills died, and O. P. Mills

becoming the administrator of his estate. was sued by the plaintiff upon the contract in February, 1887. The complaint was simply for the purchase money, $525, without any mention of interest. The defendant answered that, as informed, his intestate did agree to purchase certain calves from the plaintiff, and that the plaintiff promised to give him a written guarantee and have the animals "registered" before they were paid for, which he, the plaintiff, would not or could not do; that upon this discovery, his intestate offered to return the cattle, upon being paid his expenses, which offer was refused; and that plaintiff failed to keep his contract to the damage of the intestate $500.

The plaintiff proved that he had the heifers "registered" in "The American Jersey Herd Register" kept at Worcester, Mass. S. Harris, the only person except the parties themselves, who was present when the contract was made, testified "that he was present when the contract was made between plaintiff and intestate: four of the heifers were about 14 months old, two about 3 months old. They were very poor at the time. The understanding was that they were to be 'registered,' or certificate forwarded to that effect. Don't know if book was mentioned in which they were to be 'registered.' It was not to his knowledge. I am a Jersey cattle man to a small extent; not an expert in 'registering,' &c. 'The American Jersey Cattle Club Herd Registry' is the only registration 'Book' in this country for Jersey cattle. The cattle registered in the book spoken of by Mr. Burns (American Jersey Herd Registry) were worth no more than grades or any other cattle," &c. It was satisfactorily proved that "The American Jersey Cattle Club Herd Registry" was the only recognized registration book in this country for Jersey cattle, and that the heifers sold to the intestate Mills were not registered therein.

Under the charge of the judge, the jury found for the plaintiff the full amount of the account and interest, $705.66. Thereupon the plaintiff moved for leave to amend the complaint, so as to include a count for interest, which was refused. The defendant then moved for a new trial on the minutes, which was also refused, and the defendant appeals, alleging error as follows:

"1. In charging that if there was a contract between plaintiff

and intestate, and the contract is proved, they should find for the plaintiff with interest.

"2. In refusing the motion for a new trial.

"3. In not at least granting a new trial *nisi*, the plaintiff remitting all of the verdict over $525, demanded in the complaint.

"4. In giving $5 costs against the defendant in refusing a motion for a new trial.

"5. In charging the jury that if they concluded that the contract between plaintiff and intestate was, that there was to be a registration of the cattle, then the contract, being a verbal one, was for their interpretation.

"6. In charging that the law in regard to a verbal contract is not what Mr. Mills intended by the contract, but if Mr. Burns made an offer to Mr. Mills and Mr. Mills accepted it, it is what Mr. Burns intended Mr. Mills should understand by his promise that these should be 'registered' cattle.

"7. In charging that it was what plaintiff offered to do, and what he intended that intestate should understand that he offered to do, that should govern.

"8. In charging that the above definition should only help the jury, if they should conclude that registration had not been sufficiently defined to them by persons sufficiently competent to know.

"9. In charging that it might be that the jury sufficiently understood the technical word 'registered,' when applied to Jersey cattle, to give it a definite fixed meaning, and it was for them to say whether that definite fixed meaning was used by Mr. Burns when he guaranteed it.

"10. In charging the jury that it might be that registration in *one of the registration books* would be as good as the other.

"11. In charging that if the jury should come to the conclusion that Mr. Mills with full knowledge of the facts, accepted these cattle, whether they were registered or unregistered, would make no difference."

Exceptions 5, 6, 7, 8, and 9 substantially allege error in the charge, "That the law in regard to a verbal contract is not what Mr. Mills intended by the contract, but if Mr. Burns made an offer to Mr. Mills, which he accepted, it is what Burns intended Mills should understand by his promise that these should be reg-

istered cattle." We are not quite sure that we apprehend this clearly as applied to the facts of this case. If there had been nothing ambiguous in the terms used; if there had been a certain fixed meaning universally attached to the term "registered," then the proposition would have been entirely unobjectionable; for a distinct offer made in unequivocal terms and accepted, is the very definition of an agreement. But as we understand, such was not the case here. It was undoubtedly a part of the contract that the heifers should be "registered," whatever that may be; that is shown not only by the proof, but by the nature of the contract itself, for it can hardly be supposed that any man would agree to give $525 for six calves in bad condition, two of which were not more than three months old, unless there was something connected with them which gave or was supposed to give them unusual value. The intestate wished to breed Jersey cattle for the market, and it is clear that the promised registration as to him was an essential part of the consideration, as affording record evidence of the pure breed of the stock.

It seems, however, that there were two books of registry : one (A. J. C. C.) which afforded the best evidence of the purity of the stock registered, and generally regarded in this country as the only proper registry of Jersey cattle, and the other (A. J. C. H.) much less valuable in that respect. The contract did not specify which "registry" was meant; and the confusion has arisen from the fact that the term used, "registered," admits of more than one sense ; and that being the case, it seems to us that it was error to say that the contract should be interpreted by what was the intention of Burns, the seller, without any regard to the concurring intention of the intestate, the purchaser. It strikes us that the term used, being capable of two meanings, it was not enough to consider alone the intention of Burns. It was incumbent upon the plaintiff to make out the special contract upon which he sued. He proved that he had "registered" the cattle in the registry, which was not the approved and accepted registry of the country. There was no proof that the intestate meant that registry. "The most essential element of an agreement is the consent of the parties. If two or more parties express their consent to a common purpose, this is an agreement.

The terms of a proposal must be sufficiently certain to enable the court to say what the agreement is." 3 Am. & Eng. Encycl. Law, 841. An agreement to be binding must be understood and assented to by both parties. It is elementary that, in order to constitute a binding contract, there must be a definite promise by the party charged, accepted by the person claiming the benefit of such promise. *Chit. Con.*, 9. It takes two to make a binding bargain, and where the terms used are equivocal, both parties must assent in the same sense. The minds of the parties must meet (*Gary* v. *Watson*, 16 S. C., 623), as was strongly illustrated by the old case put by Dr. Paley in his chapter on "promises," where a commander offered to receive the surrender of a garrison without bloodshed, and then buried them alive.

This makes it unnecessary to consider the other exceptions.

The judgment of this court is, that the judgment of the Circuit Court be reversed, and the case remanded for a new trial.